UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| MICHAEL LUND<br>*Plaintiff,*<br><br>**-v-**<br><br>ARIZONA STATE UNIVERSITY; ARIZONA BOARD OF REGENTS; ARVIND VARSANI, in his individual and official capacities; SIMONA KRABERGER, in her individual and official capacities; JOHN/JANE DOES 1–10,<br>*Defendants.* | Case No.______________________________<br><br>**COMPLAINT AND JURY DEMAND** |

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

*This action alleges, inter alia, violations of Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and the First and Fourteenth Amendments to the United States Constitution as enforced through 42 U.S.C. § 1983, together with retaliation prohibited by the False Claims Act, arising from disability-based discrimination, a hostile and retaliatory research environment, suppression of Plaintiff's reports of scientific misconduct affecting federally funded research, and Plaintiff's constructive removal from his PhD trajectory at Arizona State University, thereby depriving Plaintiff of rights secured by federal law and the Constitution.*

Plaintiff MICHAEL LUND, by and through undersigned counsel, brings this civil action for damages, declaratory relief, and other equitable relief against Defendants ARIZONA STATE UNIVERSITY, the ARIZONA BOARD OF REGENTS, ARVIND VARSANI, and SIMONA KRABERGER, in their official and individual capacities where applicable, and alleges as follows:

## INTRODUCTION

1. Plaintiff Michael Lund brings this action to remedy unlawful disability discrimination, retaliation, hostile work environment, and whistleblower reprisal carried out by supervisory personnel in the Evolutionary Virology Laboratory at Arizona State University

("ASU"). Plaintiff also seeks redress for Defendants' suppression of scientific integrity concerns relating to federally funded research and their subsequent retaliatory actions culminating in Plaintiff's constructive removal on September 24, 2025.

2. Plaintiff is a disabled PhD student and computational biologist with documented conditions including c-PTSD and panic disorder. Plaintiff disclosed these disabilities to his Principal Investigator, Defendant Arvind Varsani, in 2023 during a meeting concerning Plaintiff's academic trajectory. During that disclosure, Defendant Varsani stated: "Michael, I have enough neurodivergent people in my lab." During a recorded conversation on June 6, 2025, Plaintiff quoted that remark back to Defendant Varsani, and Defendant Varsani affirmed it, responding "Right," without denial or correction. The original statement was not captured in any audio recording, but Defendant Varsani's June 6, 2025 affirmation, together with Plaintiff's contemporaneous written documentation, independently corroborates that the statement was made.

3. After Plaintiff identified multiple scientific errors, data-integrity failures, and methodological misrepresentations in federally funded research—including misclassification errors in the Sequence Demarcation Tool (SDT), fabricated statistical results in published work, and systemic misuse of BBMap, Defendants engaged in escalating retaliation. Plaintiff reported these issues in writing, in Slack messages, in emails, and in three recorded conversations with Defendants Varsani and Simona Kraberger.

4. Rather than address the scientific concerns, Defendants undermined Plaintiff's research, obstructed his PhD progress, assigned non-contributing co-authors to his work, publicly criticized his scientifically valid methods, and pressured him to replicate flawed and outdated methodologies to preserve prior publications.

5. Plaintiff was subjected to repeated discriminatory and demeaning conduct related to his disability and physical condition, including mocking of his pain-management tools,

comments about his posture and appearance following a serious 2023 car accident, and public remarks that singled him out during lab meetings. Supervisors dismissed Plaintiff's concerns, minimized his symptoms, and blamed him for the lab's dysfunction.

6. On August 7, 2025, after Plaintiff informed Defendant Kraberger that the lab environment was causing a severe mental-health crisis, she stated: "Michael, maybe you would fit better in another lab." This statement, made during a supervisory meeting and documented in Plaintiff's Tort Claim Notice and August 7, 2025, recording, effectively terminated Plaintiff's research role without due process, resulting in the loss of his PhD trajectory, funding, and academic standing.

7. On September 24, 2025, upon leaving the laboratory for the final time, Plaintiff contacted ASU's Office of University Rights and Responsibilities ("OURR"). Plaintiff did not interact with anyone at OURR directly; his only communication was a voicemail he left while leaving the office. In that voicemail, Plaintiff reported that he could no longer continue working in the lab, that his working conditions had become intolerable, that the laboratory's data-handling practices were scientifically indefensible, and that he was being pressured to publish inaccurate research. OURR did not receive, review, or request Plaintiff's supporting evidence, including his Slack messages and audio recordings, at any point in its handling of the matter. In the weeks and months that followed, Plaintiff was under ongoing mental-health treatment and was not well enough to participate in any adversarial process. OURR's only proposed course of action was to convene a sit-down meeting between Plaintiff and Defendant Varsani and other lab members, the very individuals whose conduct Plaintiff was reporting, which Plaintiff could not undertake given his condition. By the time OURR emailed Plaintiff to schedule that meeting, Plaintiff had already retained counsel. On December 30, 2025, OURR closed the matter without taking any corrective action.

8. Defendants' conduct violated Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, 42 U.S.C. § 1983, the False Claims Act retaliation provision, and Arizona state law. Plaintiff seeks compensatory damages, punitive damages where permitted, injunctive relief, reinstatement or front pay, attorneys' fees, and all other relief the Court deems just and proper.

## JURISDICTION AND VENUE

9. This civil action arises under the Constitution and laws of the United States, including Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; the Americans with Disabilities Act; 42 U.S.C. § 1983; and the False Claims Act retaliation provision, 31 U.S.C. § 3730(h). Plaintiff seeks redress for violations of his rights under the First and Fourteenth Amendments to the United States Constitution, as well as for retaliation for reporting concerns related to federally funded research.

10. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, because the action arises under federal law, and pursuant to 28 U.S.C. § 1343(a)(3)–(4), because Plaintiff seeks to redress the deprivation of rights secured by the Constitution and federal civil rights statutes.

11. This Court has supplemental jurisdiction over Plaintiff's related state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise from the same nucleus of operative fact as Plaintiff's federal claims and form part of the same case or controversy.

12. Venue is proper in the District of Arizona under 28 U.S.C. § 1391(b)(1) and (b)(2) because all Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred at Arizona State University in Tempe, Arizona.

## PARTIES

13. At all times relevant hereto, Plaintiff MICHAEL LUND is, upon information and

belief, an adult resident citizen of the State of Arizona, residing within Maricopa County. Plaintiff was a PhD student and graduate research assistant in the Evolutionary Virology Laboratory at Arizona State University during the period relevant to this Complaint.

14. At all times relevant hereto, Defendant ARIZONA STATE UNIVERSITY ("ASU") is a public university organized under the laws of the State of Arizona, headquartered in Maricopa County, Arizona, and is a recipient of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act. ASU may be served through its Office of General Counsel, PO Box 877405, Tempe, Arizona 85287-7405.

15. At all times relevant hereto, Defendant ARIZONA BOARD OF REGENTS ("ABOR") is the constitutionally created governing body for Arizona's public university system, including ASU, and is responsible for the policies, practices, and oversight of ASU and its employees. ABOR maintains offices at 2700 N. Central Avenue, Suite 400, Phoenix, Arizona 85004-4593.

16. At all times relevant hereto, Defendant ARVIND VARSANI, Principal Investigator of the Evolutionary Virology Laboratory at ASU's Biodesign Institute, is, upon information and belief, an adult resident citizen of Maricopa County, Arizona, with an employment address for service of process believed to be 1001 S. McAllister Avenue, Tempe, Arizona 85287. Said Defendant is sued in both his individual and official capacities.

17. At all times relevant hereto, Defendant SIMONA KRABERGER, Senior Scientist in the Evolutionary Virology Laboratory at ASU's Biodesign Institute and Plaintiff's direct supervisor, is, upon information and belief, an adult resident citizen of Maricopa County, Arizona, with an employment address for service of process believed to be 1001 S. McAllister Avenue, Tempe, Arizona 85287. Said Defendant is sued in both her individual and official capacities.

18. At all times relevant hereto, Defendants JOHN/JANE DOES 1–10 are individuals

whose identities are presently unknown who participated in, directed, approved, or failed to prevent the discriminatory, retaliatory, or otherwise unlawful conduct described herein. Plaintiff will seek leave of Court to amend this Complaint to identify these Defendants once their identities become known.

19. The true names and capacities of persons or entities, whether individual, corporate, associate, or otherwise, who may be responsible for some of the claims alleged herein are currently unknown to Plaintiff. Plaintiff will seek leave from the Court to amend this complaint to reflect the true names and capacities of such other responsible parties when their identities become known.

## **FACTUAL BACKGROUND**

20. Plaintiff Michael Lund is a computational biologist and PhD student in the Molecular and Cellular Biology program at Arizona State University ("ASU"). From approximately 2018 through September 24, 2025, Plaintiff worked in the Evolutionary Virology Laboratory ("Varsani Lab") at ASU's Biodesign Institute, first as a research employee and later as a graduate research assistant.

21. Plaintiff has documented disabilities, including complex post-traumatic stress disorder (c-PTSD) and panic disorder, for which he previously received federal disability benefits from 2007 to 2019. Plaintiff also suffers from chronic back pain resulting from a serious car accident on December 16, 2023. These conditions were known to his supervisors.

22. Plaintiff disclosed his disabilities to Defendant Arvind Varsani, Principal Investigator of the Varsani Lab, in 2023 during a meeting concerning Plaintiff's academic trajectory. In response to this disclosure, Defendant Varsani stated: *"Michael, I have enough neurodivergent people in my lab."* During a recorded conversation on June 6, 2025, Plaintiff quoted that remark back to Defendant Varsani, and Defendant Varsani affirmed it, responding

"Right," without denial or correction. The original statement was not captured in any audio recording, but Defendant Varsani's June 6, 2025 affirmation independently corroborates that the statement was made.

23. Plaintiff had been promised a PhD position following completion of his Master's degree. After Plaintiff began raising concerns about scientific methodology and data integrity within the lab, the promised PhD position was withdrawn. The withdrawal occurred shortly after Plaintiff's disability disclosure and after he raised concerns about flawed research practices.

24. Following Plaintiff's December 2023 car accident, Plaintiff experienced chronic and severe back pain. Defendants were aware of this condition. Plaintiff was subjected to comments and teasing related to his physical condition, including remarks by Defendant Varsani that Plaintiff was "giving up height" and looked "shriveled up," and teasing by lab members regarding Plaintiff's use of lacrosse balls and a foam roller to manage pain.

25. Plaintiff was also singled out publicly during lab meetings. During the COVID-19 pandemic, Defendant Varsani addressed the lab, a group of mostly slender individuals, with a warning about physical fitness and susceptibility to illness, stating that "muscles won't protect you." As the only muscular individual in the room, Plaintiff was singled out by the comment.

26. Throughout 2023–2025, Plaintiff identified multiple scientific errors and data-integrity failures in federally funded research conducted in the Varsani Lab. These included:

a. a similarity-scoring formula in the Sequence Demarcation Tool ("SDT") that discards gaps and insertions and deletions and does not account for differences in sequence length, producing inflated and scientifically inaccurate similarity scores and rendering SDT's distance matrices unreliable for downstream analysis;

b. misrepresentation of SDT's methodology in published literature, including

published claims that SDT used Needleman-Wunsch pairwise alignment when it in fact relied on a heuristic, random-seed-dependent multiple-sequence aligner;

c. fabricated statistical results in a published paper (Dayaram et al., 2016), including Chi-squared values that Plaintiff and another lab member independently determined could not have been generated from the underlying data; and

d. a systemic error in the lab's short-read mapping pipeline, arising from BBMap's default handling of ambiguous reads, that makes per-genome presence and absence and coverage results turn on an arbitrary software setting rather than on the underlying sequencing data, rendering conclusions drawn from those results unreliable across numerous publications.

27. Plaintiff reported these issues repeatedly to Defendants Varsani and Simona Kraberger, Senior Scientist and Plaintiff's direct supervisor, through Slack messages, emails, in-person discussions, and three recorded conversations. Plaintiff proposed corrections, provided technical demonstrations, and offered scientifically valid alternatives.

28. Rather than address the concerns, Defendants responded with hostility, dismissal, and retaliation. Plaintiff's scientifically valid findings were minimized, rejected, or ignored. Defendants pressured Plaintiff to replicate the flawed outputs of SDT1, discouraged him from implementing correct methodologies, and insisted that his new tool match the scientifically invalid results of the original SDT.

29. Plaintiff's PhD project involved building a corrected replacement for the legacy SDT software, a successor tool referred to herein as "SDT2." From the outset, the project was structured not as a scientific collaboration but as a commission. Defendant Varsani assigned five

co-authors to the project, none of whom had experience in Python or contributed to the codebase, and whose involvement consisted solely of dictating features rather than providing scientific or technical input. Although Plaintiff's own work on SDT2 reflected sound scientific methods, Defendant Varsani directed that SDT2 reproduce the legacy tool's flawed and invalid outputs rather than correct them.

30. Because the assigned co-authors provided no technical contribution, Plaintiff sought technical assistance outside the lab. Two individuals assisted him, in distinct roles.

31. Josiah Ivey is a professional full-stack software developer employed by OpenStax and is unaffiliated with ASU. Mr. Ivey is Plaintiff's friend, whom Plaintiff asked to help build the SDT2 application. Mr. Ivey worked alongside Plaintiff for approximately two years on the application's architecture and implementation. Approximately two years of Plaintiff's and Mr. Ivey's uncompensated labor were expended on the project, which Defendants did not permit to replace the legacy tool.

32. Dr. Qiyun Zhu is a bioinformatics scientist whom Plaintiff invited to join his paper as a scientific collaborator. Without knowing that Defendant Varsani was directing the methodological choices at issue, Dr. Zhu repeatedly and independently advised Plaintiff against those same choices. Dr. Zhu's guidance consistently confirmed that Defendant Varsani's directives were scientifically unsound. Plaintiff regards Dr. Zhu as a credible scientist whose review would validate the concerns raised in this Complaint. When Dr. Zhu offered scientifically supported feedback that contradicted Defendant Varsani, Defendant Varsani reacted with hostility.

33. Defendants repeatedly demanded that Plaintiff make his implementation reproduce the output of the legacy tool. Plaintiff's implementation used modern, optimized, and appropriate tools for pairwise sequence alignment, specifically the Needleman-Wunsch algorithm

implemented through a highly optimized modern library. The Needleman-Wunsch algorithm, though long-established, remains a correct and widely used standard for this task in current applications. The legacy tool, by contrast, relied on a heuristic, random-seed-dependent multiple-sequence aligner that is neither optimal nor appropriate for the comprehensive pairwise comparisons required for viral taxonomy, and it excluded gaps and unaligned regions from its similarity scoring. A heuristic multiple-sequence aligner does not produce the reliable, reproducible pairwise alignments that taxonomic demarcation requires, because its output depends on the alignment of unrelated sequences and on a random seed rather than on the direct optimal comparison of the two sequences at issue.

34. The scientific defect is demonstrable without any specialized biological knowledge. Because the legacy scoring formula excludes gaps and unaligned regions, it will assign a perfect similarity score to a 100-nucleotide sequence compared against a 1,000-nucleotide sequence whenever the shorter sequence's 100 nucleotides match, treating that partial, 100-nucleotide correspondence as fully equivalent to a true 1,000-to-1,000 match across every position, and imposing no penalty for the 900 unmatched nucleotides. Because the Varsani Lab worked extensively with short-read sequencing data, this length-blind scoring behavior was especially egregious and produced systematically misleading similarity results. Defendants nonetheless pressured Plaintiff to hard-code fixed "magic" parameters and to remove the user-configurable settings required by accepted scientific practice, so that his corrected tool would reproduce the legacy tool's invalid results.

35. Throughout the project, Defendant Varsani repeatedly told members of the lab that Plaintiff's "scores" were bad, while never identifying any flaw in Plaintiff's alignments or in the underlying science. Plaintiff's alignments were scientifically sound; the criticism was directed solely at the numerical scores, because they did not match the legacy tool. Defendant Varsani

treated the legacy tool's output as the benchmark of correctness and deemed any deviation from it "not good," despite there being no scientific basis for benchmarking a correct Needleman-Wunsch pairwise identity against the output of a heuristic multiple-sequence aligner. Defendant Varsani repeatedly hounded Plaintiff to publish a single figure showing how Plaintiff's scores related to the legacy tool's scores, having fixed the desired result before the work began, and for years pressured and punished Plaintiff for declining to conform his correct results to the legacy tool's inaccurate ones.

36. Plaintiff's implementation incorporated two superior and complementary scoring methods: a modern, optimized Needleman-Wunsch pairwise aligner and an alignment-free scoring method, both of which outperform the legacy tool's scoring for the pairwise-identity calculations used in viral taxonomy. Defendant Varsani suppressed both methods, repeatedly telling others that the alignment-free scores were "only good to 80%" and "only meant for clustering," statements that were scientifically baseless.

37. Defendants instructed lab members to use Plaintiff's new visualization features but to feed them with data generated from the flawed legacy tool. When Plaintiff offered to implement the flawed methods exactly as Defendants wished, on the condition that his name be removed from the resulting work, Defendants refused. To be clear, the flawed successor tool Defendant Varsani demanded, referred to herein as "SDT2," is dead to Plaintiff: Plaintiff refuses to participate in, contribute to, endorse, or be associated with that product, and disclaims any authorship of or interest in it. If Defendants insist on producing SDT2 so that others may publish it, that is their prerogative, but Plaintiff's name shall not appear on it, be attributed to it, or be used in connection with it in any capacity, and Plaintiff affirmatively disclaims it.

38. For clarity, Defendant Varsani misconfigured BBMap across numerous publications by using a setting for ambiguous reads that causes per-genome coverage and

presence and absence results to turn on an arbitrary software default rather than on the underlying sequencing data. Plaintiff and Defendant Kraberger identified this misconfiguration, and Plaintiff informed Defendant Varsani of the issue and demonstrated its effect. Rather than correct it, Defendant Varsani blamed Plaintiff for the error, rejected Plaintiff's findings, characterized Plaintiff's corrected workflow as "mis-mapping," instructed lab members not to use that corrected workflow, and continued to rely on the misconfigured setting after Plaintiff had reported the problem.

39. Defendant Varsani's insistence on preserving the legacy tool's invalid outputs was not merely scientific stubbornness; it reflected a deliberate effort to entrench and conceal his prior work. Over approximately the past ten years, Defendant Varsani republished substantially the same tool on multiple occasions, each framed around the introduction of a newly described virus family and each relying on the Sequence Demarcation Tool. The practical effect was that any researcher whose dataset contained one of those virus classifications would be channeled into using Defendant Varsani's tool, often without awareness of the published misrepresentation that the tool used Needleman-Wunsch pairwise alignment when it did not.

40. As part of this effort, Defendant Varsani's own downstream taxonomic-update and species-profile publications route the operative species-demarcation thresholds through a chain of intermediary papers rather than citing the original PLoS ONE SDT paper directly. As a result, a researcher relying on the current taxonomic literature is led through successive intermediary citations and does not readily reach the original PLoS ONE paper, in which the tool's methodology, including the representation that it used Needleman-Wunsch pairwise alignment, was described. Plaintiff further alleges, based on his own knowledge and on information and belief, that Defendant Varsani verbally instructed lab members, including Plaintiff, not to cite the original PLoS ONE version of the SDT paper; the precise form, timing, and extent of those

instructions are matters to be developed in discovery. Plaintiff will seek in discovery a citation analysis of the relevant taxonomic literature to establish the extent and effect of this practice. This pattern is consistent with knowledge of, and an effort to obscure the ready traceability of, the underlying methodological representation.

41. Plaintiff also conducted an independent analysis of publication and citation patterns, identifying Defendant Varsani as a statistical outlier with unusually high internal citation rates and supervisory citations, suggesting potential unethical publishing practices. Plaintiff's findings indicated that Defendant Varsani had published 213 papers in five years, an output two to three times higher than peers, and that 31.9% of his citations were internal.

42. Upon information and belief, Defendant Varsani has authored an extraordinarily large volume of publications, a substantial portion of which introduce or rename virus taxa and route the resulting classifications through the flawed SDT demarcation described above. The cumulative effect has been to expand the naming space year over year, including through idiosyncratic taxon names drawn from fiction and popular culture, without adding corresponding scientific clarity, while channeling downstream researchers into Defendant Varsani's tool. Plaintiff further observed recurring statistical errors across this body of work, of which the fabricated or mathematically impossible Chi-squared values in Dayaram et al. (2016) are one example, and that Defendant Varsani has come to rely on a commercial subscription service to generate the figures in his publications

43. Plaintiff observed preferential treatment of another PhD student, Rohan Antonio Bandoo, who received extensive assistance from Defendants despite acknowledged deficiencies in his work. Defendant Varsani privately stated that the student was "in no way ready or capable to defend," yet passed him. Plaintiff also reported that Mr. Bandoo smuggled and used marijuana at an international conference, but no disciplinary action was taken.

44. On May 23, 2025, during a recorded conversation, Defendant Kraberger acknowledged that Defendant Varsani was “being a bit of a dick right now” and admitted that he was not handling matters well. Despite this acknowledgment, no corrective action was taken.

45. On another occasion, when Plaintiff described to Defendant Kraberger how harshly Defendant Varsani was treating him, Defendant Kraberger responded that it might be "just a culture thing" and that "Americans are so sensitive." Rather than address the treatment Plaintiff was describing, Defendant Kraberger attributed Plaintiff's concerns to his cultural or national background and characterized his reaction as oversensitivity.

46. On June 6, 2025, during a second recorded meeting, Plaintiff confronted Defendant Varsani about his prior discriminatory statement regarding “neurodivergent people.” Defendant Varsani did not deny making the statement and responded, “Right,” when Plaintiff repeated it. Defendant Kraberger was present and did not dispute the statement.

47. On August 7, 2025, during a third recorded meeting, Plaintiff informed Defendant Kraberger that the lab environment was causing a severe mental-health crisis. Defendant Kraberger responded: *“Michael, maybe you would fit better in another lab.”* This statement effectively terminated Plaintiff’s research role.

48. Plaintiff’s constructive removal occurred without due process, without academic review, and without any formal performance-related justification. Plaintiff lost his research position, PhD trajectory, academic standing, and future career opportunities.

49. Plaintiff's only contact with OURR was the September 24, 2025 voicemail described above. Plaintiff did not meet with OURR, and OURR never obtained or reviewed his recordings, emails, or documentation. OURR proposed only a joint meeting with the very supervisors Plaintiff was reporting, which Plaintiff was in no condition to attend, and it closed the matter on December 30, 2025 without corrective action.

50. Once on notice of Plaintiff's report, ASU failed to offer any reasonable accommodation, failed to separate Plaintiff from the individuals he had reported, and failed to protect him from the consequences of the hostile and retaliatory environment.

51. As a result of Defendants' actions, Plaintiff suffered severe emotional distress, exacerbation of his disabilities, loss of academic and professional opportunities, and significant harm to his career trajectory. The years-long pressure Defendants placed on Plaintiff to conform his work to scientifically invalid methods also caused profound personal harm, damaging Plaintiff's home life and personal relationships, including his longstanding friendship and working relationship with Mr. Ivey.

52. Separately and after leaving the laboratory, Plaintiff independently designed and built, from scratch, a distinct software application that he named CSAW. CSAW is not SDT2 and is not a version of the legacy SDT tool. Plaintiff does not claim to have authored the underlying alignment or scoring algorithms, which are established and publicly available; rather, Plaintiff's work consists of integrating a set of powerful but difficult-to-use existing tools into a single, streamlined, and reproducible pipeline through which organized data flows and is analyzed accurately, optimally, and rapidly, together with Plaintiff's corrected approach to scoring. Plaintiff created CSAW to address the lack of reproducibility and the manual, error-prone data practices he had observed in the Varsani Lab, where taxonomic assignments were frequently made by hand in commercial spreadsheet software. CSAW is transparent and reproducible by design: it cannot be executed without recording every analysis parameter and printing a complete settings record with its output, and it encodes the underlying data as a scannable code so that any reviewer may access and verify the inputs directly. Using an established alignment-free scoring method together with a dimensionality-reduction technique, Plaintiff used CSAW to sort, with high accuracy, a mixed dataset of approximately 5,000 virus genomes spanning all major

taxonomic groups and genome types, including double-stranded and single-stranded DNA and RNA viruses, in approximately ten minutes; by contrast, the clustering approach then in use in the Varsani Lab required hours of remote-server processing for only a few hundred sequences and could not be readily explained by either supervisor. When Plaintiff demonstrated CSAW's results to Defendants Varsani and Kraberger, they criticized the work despite CSAW being an early, pre-release application still in active development.

**COUNT I**
**DISABILITY DISCRIMINATION**
**SECTION 504 OF THE REHABILITATION ACT OF 1973 (29 U.S.C. § 794)**
***(Against Defendants Arizona State University and the Arizona Board of Regents)***

53. Plaintiff hereby repeats all of the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

54. Section 504 of the Rehabilitation Act prohibits discrimination against an otherwise qualified individual with a disability by any program or activity receiving federal financial assistance.

55. At all times relevant hereto, Defendants Arizona State University ("ASU") and the Arizona Board of Regents ("ABOR") were recipients of federal financial assistance within the meaning of Section 504.

56. Plaintiff is an individual with disabilities, including complex post-traumatic stress disorder (c-PTSD), panic disorder, and chronic back pain resulting from a December 16, 2023, automobile accident.

57. Plaintiff disclosed these disabilities to his supervisors, including Defendant Arvind Varsani, during discussions regarding his academic trajectory and performance.

58. Plaintiff was otherwise qualified to participate in ASU's Molecular and Cellular Biology PhD program and to perform the essential functions of his research position. Plaintiff

successfully completed his Master's degree, produced high-quality computational work, and independently developed advanced bioinformatics tools used in the lab.

59. After Plaintiff disclosed his disabilities, Defendant Varsani responded: *"Michael, I have enough neurodivergent people in my lab."* Defendant Varsani later affirmed this statement, responding "Right," during a recorded conversation on June 6, 2025, when Plaintiff restated it.

60. Shortly after this disclosure, Plaintiff's previously promised PhD position was withdrawn without academic justification.

61. Plaintiff was subjected to repeated disability-related comments and ridicule, including remarks that he was "giving up height," looked "shriveled up," and public comments during lab meetings that singled him out based on his physical condition.

62. Plaintiff was also subjected to teasing by lab members for using pain-management tools necessitated by his back injury.

63. Plaintiff was denied equal access to academic opportunities, including fair evaluation, mentorship, and advancement, and was treated less favorably than similarly situated students without disabilities.

64. Plaintiff was subjected to a hostile academic and research environment that was severe, pervasive, and directly related to his disabilities.

65. On August 7, 2025, after Plaintiff reported that the lab environment was causing a severe mental-health crisis, Defendant Simona Kraberger stated: *"Michael, maybe you would fit better in another lab."* This statement effectively terminated Plaintiff's research role and removed him from his PhD trajectory.

66. Plaintiff's removal occurred without due process, without academic review, and without any legitimate performance-related basis.

67. The adverse actions taken against Plaintiff, including denial of his PhD position,

hostile treatment, and constructive removal, occurred after and because of Plaintiff's disability disclosures and requests for understanding and support.

68. The temporal proximity between Plaintiff's disability disclosure, the discriminatory statements, and the adverse actions further supports causation.

69. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered significant harm, including the loss of his PhD trajectory and the academic career he had been working toward for years; the loss of research opportunities, mentorship, and professional advancement within his field; and substantial emotional distress, including the exacerbation of his c-PTSD, panic disorder, and post-accident physical symptoms. Plaintiff also experienced reputational damage within the scientific community, diminished future earning capacity, and the derailment of his professional path in computational biology and viral genomics. These injuries were the natural and foreseeable consequences of Defendants' actions and continue to affect Plaintiff's academic, professional, and personal life.

## COUNT II
## SECTION 504 OF THE REHABILITATION ACT & TITLE II OF THE AMERICANS WITH DISABILITIES ACT
***(Against Defendants Arizona State University and the Arizona Board of Regents)***

70. Plaintiff hereby repeats all of the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

71. Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act prohibit recipients of federal financial assistance and public entities from retaliating against an individual for engaging in protected activity, including disclosing a disability, requesting support or accommodation, or opposing disability-based discrimination.

72. At all times relevant hereto, Defendants Arizona State University ("ASU") and the Arizona Board of Regents ("ABOR") were recipients of federal financial assistance and public

entities subject to the anti-retaliation provisions of Section 504 and the ADA.

73. Plaintiff engaged in protected activity when he disclosed his disabilities to his supervisors, including Defendant Arvind Varsani, and when he raised concerns about discriminatory treatment, hostile conduct, and the impact of the lab environment on his mental health.

74. Plaintiff further engaged in protected activity when he requested understanding and support related to his disabilities, including during meetings on June 6, 2025, and August 7, 2025, where he explained the severe mental-health impact of the lab environment.

75. Following Plaintiff's protected disclosures, Defendant Varsani responded with hostility and discriminatory remarks, including stating: *"Michael, I have enough neurodivergent people on my team."*

76. Shortly after Plaintiff's disability disclosure and protected activity, Defendants withdrew Plaintiff's previously promised PhD position without academic justification.

77. Plaintiff was subjected to escalating hostility, including public comments about his physical condition, ridicule related to his disability-related symptoms, and exclusion from academic opportunities and mentorship.

78. Plaintiff was further subjected to adverse treatment after raising concerns about the impact of the lab environment on his mental health, including being told by Defendant Simona Kraberger on August 7, 2025: *"Michael, maybe you would fit better in another lab."*

79. This statement effectively terminated Plaintiff's research role and removed him from his PhD trajectory.

80. Plaintiff's removal occurred shortly after his protected disclosures and requests for support, and was not based on performance, academic evaluation, or legitimate academic criteria.

81. The temporal proximity between Plaintiff's protected activity and the adverse

actions taken against him, combined with the discriminatory statements made by Defendants, supports a causal connection between Plaintiff's protected activity and the retaliation he experienced.

82. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered significant harm, including the loss of his PhD trajectory and academic career path; the loss of research opportunities, mentorship, and professional advancement; and substantial emotional distress, including the exacerbation of his c-PTSD, panic disorder, and post-accident physical symptoms. Plaintiff also experienced reputational harm within the scientific community, diminished future earning capacity, and long-term disruption to his professional trajectory in computational biology and viral genomics. These injuries were the natural and foreseeable consequences of Defendants' retaliatory actions and continue to affect Plaintiff's academic, professional, and personal life.

**COUNT III**
**RETALIATION UNDER THE FALSE CLAIMS ACT 31 U.S.C. § 3730(h)**
***(Against Defendants Arizona State University, Varsani, and Kraberger)***

83. Plaintiff hereby repeats all of the allegations contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

84. The False Claims Act ("FCA"), 31 U.S.C. § 3730(h), prohibits an employer or agent of an employer from retaliating against an employee, contractor, or agent for engaging in protected activity, including efforts to stop violations of the FCA or reporting concerns regarding the misuse of federal funds.

85. At all times relevant hereto, Defendants Arizona State University ("ASU"), the Arizona Board of Regents ("ABOR"), and Defendants Arvind Varsani and Simona Kraberger were engaged in research programs funded in whole or in part by federal grants, including grants supporting virology, genomics, and computational biology research conducted in the Varsani Lab.

86. Plaintiff engaged in protected activity under the FCA when he raised concerns regarding scientific misconduct, data-integrity failures, and methodological misrepresentations affecting federally funded research conducted in the Varsani Lab.

87. Plaintiff identified and reported multiple issues that could materially affect the accuracy, reliability, and integrity of federally funded research outputs, including but not limited to:

a. the use of a similarity-scoring formula in the Sequence Demarcation Tool ("SDT") that discards gaps and insertions and deletions and does not account for differences in sequence length, producing inflated and scientifically inaccurate similarity scores and rendering SDT's distance matrices unreliable for downstream analysis;
b. misrepresentation of SDT's methodology in published literature, including published claims that SDT used Needleman-Wunsch pairwise alignment when it in fact relied on a heuristic, random-seed-dependent multiple-sequence aligner;
c. fabricated or mathematically impossible statistical results in a published paper (Dayaram et al., 2016), including Chi-squared values that could not be generated from the underlying data; and
d. a systemic error in the lab's short-read mapping pipeline, arising from BBMap's default handling of ambiguous reads ("ambig=best"), that makes per-genome presence and absence and coverage results turn on an arbitrary software setting rather than on the underlying sequencing data, undermining the reliability of numerous publications and ongoing federally funded research projects.

88. Plaintiff reported these concerns to Defendants Varsani and Kraberger through Slack messages, emails, in-person discussions, and three recorded meetings, during which Plaintiff provided technical demonstrations, proposed corrections, and explained the scientific and ethical

implications of continuing to use flawed methodologies.

89. Plaintiff's reports were made in good faith and were aimed at preventing the submission, publication, or reliance upon inaccurate or misleading scientific results in federally funded research.

90. After Plaintiff raised these concerns, Defendants responded with hostility, dismissal, and escalating retaliation. Plaintiff's scientifically valid findings were minimized, rejected, or ignored, and Defendants pressured Plaintiff to replicate the flawed outputs of SDT1 rather than implement scientifically accurate methods.

91. Defendants further retaliated by undermining Plaintiff's research role, excluding him from academic opportunities, criticizing him for producing scientifically correct results that did not match the flawed legacy tool, and suppressing his improved methodologies, including his modern aligner and alignment-free scoring method ("lzani").

92. Plaintiff's protected activity was closely followed by adverse actions, including the withdrawal of his promised PhD position, public criticism, exclusion from lab functions, and ultimately his constructive removal from the Varsani Lab on August 7, 2025.

93. During the August 7, 2025, meeting, after Plaintiff again raised concerns about the scientific environment and the retaliatory conduct he was experiencing, Defendant Kraberger stated: "Michael, maybe you would fit better in another lab," effectively terminating Plaintiff's research role.

94. Plaintiff's removal was not based on performance, academic evaluation, or legitimate research criteria, but occurred after and because of Plaintiff's repeated efforts to report and correct scientific misconduct affecting federally funded research.

95. The temporal proximity between Plaintiff's protected activity and the adverse actions taken against him, combined with Defendants' hostility toward his scientific-integrity

reports, supports a causal connection between Plaintiff's protected activity and the retaliation he experienced.

96. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered significant harm, including the loss of his PhD trajectory and academic career path; the loss of research opportunities, mentorship, and professional advancement; and substantial emotional distress, including the exacerbation of his c-PTSD, panic disorder, and post-accident physical symptoms. Plaintiff also experienced reputational harm within the scientific community, diminished future earning capacity, and long-term disruption to his professional trajectory in computational biology and viral genomics. These injuries were the natural and foreseeable consequences of Defendants' retaliatory actions and continue to affect Plaintiff's academic, professional, and personal life.

**COUNT IV**
**FIRST AMENDMENT RETALIATION 42 U.S.C. § 1983**
***(Against Defendants Varsani and Kraberger in Their Individual Capacities)***

97. Plaintiff hereby repeats all of the allegations and exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

98. At all times relevant hereto, Defendants Arvind Varsani and Simona Kraberger were acting under color of state law as employees, agents, and supervisors within Arizona State University, a public institution governed by the Arizona Board of Regents.

99. The First Amendment to the United States Constitution protects individuals from retaliation by state actors for engaging in protected speech, including speech on matters of public concern such as scientific integrity, research accuracy, and the proper use of federal research funds.

100. Plaintiff engaged in protected speech when he raised concerns regarding scientific misconduct, data-integrity failures, and methodological misrepresentations affecting federally funded research conducted in the Varsani Lab.

101. Plaintiff's protected speech included reporting:

a. the use of a similarity-scoring formula in the Sequence Demarcation Tool ("SDT") that discards gaps and insertions and deletions and does not account for differences in sequence length, producing inflated and scientifically inaccurate similarity scores and rendering SDT's distance matrices unreliable for downstream analysis;

b. misrepresentation of SDT's methodology in published literature, including claims that SDT used Needleman-Wunsch pairwise alignment when it in fact relied on a heuristic, random-seed-dependent multiple-sequence aligner;

c. fabricated or mathematically impossible statistical results in a published paper (Dayaram et al., 2016); and

d. a systemic error in the lab's short-read mapping pipeline, arising from BBMap's default handling of ambiguous reads ("ambig=best"), that makes per-genome presence and absence and coverage results turn on an arbitrary software setting rather than on the underlying sequencing data, undermining the reliability of numerous publications and ongoing federally funded research projects.

102. Plaintiff raised these concerns through Slack messages, emails, in-person discussions, and three recorded meetings with Defendants Varsani and Kraberger, during which he provided technical demonstrations and explained the scientific and ethical implications of continuing to use flawed methodologies.

103. Plaintiff's speech was made in his capacity as a researcher and student speaking on matters of academic and scientific concern, not as part of any official duty to defend or conceal the lab's practices. Plaintiff's speech therefore constitutes protected academic expression under the First Amendment.

104. Defendants Varsani and Kraberger were aware of Plaintiff's protected speech and responded with hostility, dismissal, and escalating retaliation.

105. Following Plaintiff's protected speech, Defendants undermined his research role, criticized him for producing scientifically accurate results that did not match the flawed legacy tool, suppressed his improved methodologies, and pressured him to replicate scientifically invalid outputs.

106. Defendants further retaliated by withdrawing Plaintiff's previously promised PhD position, excluding him from academic opportunities, and subjecting him to a hostile environment.

107. On August 7, 2025, after Plaintiff again raised concerns about scientific integrity and the retaliatory conduct he was experiencing, Defendant Kraberger stated: "Michael, maybe you would fit better in another lab," effectively terminating Plaintiff's research role and removing him from his PhD trajectory.

108. Plaintiff's removal was not based on performance, academic evaluation, or legitimate research criteria, but occurred after and because of Plaintiff's protected speech regarding scientific misconduct and the integrity of federally funded research.

109. The temporal proximity between Plaintiff's protected speech and the adverse actions taken against him, combined with Defendants' hostility toward his scientific-integrity reports, supports a causal connection between Plaintiff's protected speech and the retaliation he experienced.

110. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff suffered significant harm, including the loss of his PhD trajectory and academic career path; the loss of research opportunities, mentorship, and professional advancement; and substantial emotional distress, including the exacerbation of his c-PTSD, panic disorder, and post-accident physical symptoms. Plaintiff also experienced reputational harm within the scientific community,

diminished future earning capacity, and long-term disruption to his professional trajectory in computational biology and viral genomics. These injuries were the natural and foreseeable consequences of Defendants' retaliatory actions and continue to affect Plaintiff's academic, professional, and personal life.

**COUNT V**
**FOURTEENTH AMENDMENT RETALIATION (42 U.S.C. § 1983)**
***(Against Varsani and Kraberger in Their Individual Capacities)***

111. Plaintiff hereby repeats all of the allegations and Exhibits contained in the Complaint thus far above and incorporates the same as if fully set forth at length herein.

112. At all times relevant hereto, Defendants Arvind Varsani and Simona Kraberger were acting under color of state law as employees, agents, and supervisors within Arizona State University, a public institution governed by the Arizona Board of Regents.

113. The Fourteenth Amendment to the United States Constitution guarantees all persons equal protection of the laws and prohibits state actors from intentionally discriminating against individuals based on disability or perceived disability.

114. Plaintiff is an individual with disabilities, including complex post-traumatic stress disorder (c-PTSD), panic disorder, and chronic back pain resulting from a December 20, 2023, automobile accident.

115. Plaintiff disclosed these disabilities to Defendants Varsani and Kraberger during discussions regarding his academic trajectory, performance, and the impact of the lab environment on his mental health.

116. After Plaintiff disclosed his disabilities to Defendant Varsani in 2023, Varsani stated: "Michael, I have enough neurodivergent people on my team." During a recorded conversation on June 6, 2025, Plaintiff quoted that remark back to Defendant Varsani, and Defendant Varsani affirmed it, responding "Right," without denial or correction. Although the

original statement made in 2023 was not captured on any audio recording, Defendant Varsani's June 6, 2025 affirmation on audio recording, together with Plaintiff's contemporaneous written documentation, independently corroborates that the statement was made.

117. Following Plaintiff's disability disclosure, Defendants treated Plaintiff less favorably than similarly situated students without disabilities, including but not limited to students who were permitted to continue in the lab, receive mentorship, and advance academically without interference.

118. Plaintiff's previously promised PhD position was withdrawn shortly after his disability disclosure, without academic justification and without any legitimate performance-based rationale.

119. Plaintiff was subjected to repeated disability-related comments and ridicule, including remarks that he was "giving up height," looked "shriveled up," and public comments during lab meetings that singled him out based on his physical condition.

120. Plaintiff was also subjected to teasing by lab members for using pain-management tools necessitated by his back injury, conduct that Defendants Varsani and Kraberger permitted and failed to correct.

121. Plaintiff was denied equal access to academic opportunities, including fair evaluation, mentorship, and advancement, and was excluded from research opportunities and professional development provided to non-disabled students.

122. On August 7, 2025, after Plaintiff reported that the lab environment was causing a severe mental-health crisis, Defendant Kraberger stated: "Michael, maybe you would fit better in another lab," effectively terminating Plaintiff's research role and removing him from his PhD trajectory.

123. Plaintiff's removal occurred without due process, without academic review, and

without any legitimate academic basis, and was instead motivated by discriminatory animus toward Plaintiff's disabilities.

124. The temporal proximity between Plaintiff's disability disclosure, the discriminatory statements made by Defendants, and the adverse actions taken against him further supports an inference of discriminatory intent.

125. Defendants' conduct was intentional, purposeful, and undertaken with deliberate indifference to Plaintiff's constitutional rights.

126. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered significant harm, including the loss of his PhD trajectory and academic career path; the loss of research opportunities, mentorship, and professional advancement; and substantial emotional distress, including the exacerbation of his c-PTSD, panic disorder, and post-accident physical symptoms. Plaintiff also experienced reputational harm within the scientific community, diminished future earning capacity, and long-term disruption to his professional trajectory in computational biology and viral genomics. These injuries were the natural and foreseeable consequences of Defendants' discriminatory actions and continue to affect Plaintiff's academic, professional, and personal life.

**COUNT VI**
**DECLARATORY JUDGMENT**
**INTELLECTUAL PROPERTY OWNERSHIP 28 U.S.C. § 2201**
***(Against Defendants Arizona State University and the Arizona Board of Regents)***

127. Plaintiff hereby repeats all of the allegations and Exhibits contained in the Complaint thus far above and incorporates same as if fully set forth at length herein.

128. An actual and immediate controversy exists between Plaintiff and Defendants ASU and ABOR regarding the ownership of CSAW, the bioinformatics application Plaintiff independently developed. CSAW is a distinct and independent tool and is not the SDT2 successor

described above, which Plaintiff disclaims. Plaintiff does not claim ownership of the established, publicly available algorithms that CSAW employs; the intellectual property at issue is Plaintiff's application itself, including its integration, data-handling pipeline, and reproducibility design.

129. Plaintiff developed CSAW independently, using his own equipment, his own computational resources, and his own time, outside the scope of any ASU-directed assignment, employment obligation, or funded project.

130. Plaintiff’s work was not commissioned by ASU in any manner that would assign ownership to ASU, was not created under any written agreement assigning intellectual property rights to ASU, and was not developed using ASU-owned hardware, software licenses, or laboratory infrastructure.

131. Plaintiff’s contributions were original, substantial, and the product of his independent work and technical expertise, including the design and integration of the application, its data-handling pipeline, its reproducibility features, and its computational workflows, none of which were derived from or dependent upon ASU intellectual property.

132. Defendants have asserted, implied, or otherwise suggested that this software constitutes ASU intellectual property or that ASU may claim ownership or control over Plaintiff's work, despite the absence of any contractual, statutory, or factual basis for such a claim.

133. Plaintiff disputes Defendants’ assertions and maintains that he is the sole owner of CSAW and all intellectual property rights associated with the application.

134. The parties’ conflicting positions create a present, substantial, and justiciable controversy requiring resolution by this Court pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

135. A judicial declaration is necessary to determine and confirm that Plaintiff is the sole owner of SDT2 and all related intellectual property, and that Defendants have no ownership

interest, control, or claim to Plaintiff's independently developed software or methodologies.

136. A declaration of rights will resolve uncertainty, prevent future disputes, and protect Plaintiff from improper claims of ownership or interference with his ability to publish, license, or further develop his work.

137. A declaration of rights will resolve uncertainty, prevent future disputes, and protect Plaintiff's ability to complete, publish, present, license, or further develop CSAW at another institution, free of any interference or ownership claim by Defendants.

## PRAYER FOR RELIEF

138. **WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award the following relief:

a. Compensatory damages in an amount to be determined at trial for the emotional distress, reputational harm, economic losses, and other injuries Plaintiff sustained as a result of Defendants' unlawful conduct, including the fair value of Plaintiff's independently developed software; the fair value of the years of software-development labor, including substantial uncompensated labor by Plaintiff and by the collaborator Plaintiff engaged, expended on work Defendants obstructed and refused to permit to replace the legacy tool; and the value of the uncompensated labor Plaintiff expended in investigating and documenting Defendants' scientific misconduct;

b. Back pay, front pay, and loss of future earning capacity, including the value of lost academic and research opportunities, lost professional advancement, and diminished career trajectory; together with the value of lost employment benefits; and, as a consequence of the harm Defendants caused, Defendants' responsibility,

going forward and for the remainder of Plaintiff's life, for maintaining health insurance coverage for Plaintiff and his dependents equivalent to the Blue Cross Blue Shield coverage Plaintiff held during his employment as a research analyst at Arizona State University, funded by Defendants;

c. Equitable relief in the form of conferral of the Doctor of Philosophy degree Plaintiff earned, together with restoration of Plaintiff's academic standing;

d. Declaratory and injunctive relief confirming that Plaintiff is the sole owner of CSAW, the application he independently developed, and that Defendants have no ownership interest in, control over, or right to interfere with that work, so that Plaintiff may complete, publish, present, license, and submit CSAW, together with his scholarly findings and critique concerning the current state of viral taxonomy, Defendants' roles in that state of affairs, and CSAW as the proposed solution, at another institution of his choosing and free of any obstruction or interference by Defendants; and further declaring that Plaintiff neither owns nor seeks any flawed successor tool ("SDT2") and that Plaintiff's name shall not be attributed to any such tool, nor to Defendant Varsani's other publications, without Plaintiff's consent;

e. Injunctive relief prohibiting further discrimination or retaliation, and requiring Defendants to correct any records reflecting adverse actions taken against Plaintiff;

f. Punitive damages against the individual Defendants for their intentional, malicious, or reckless disregard of Plaintiff's constitutional and statutory rights, to the extent permitted by law;

g. Attorneys' fees and costs pursuant to 29 U.S.C. § 794a, 42 U.S.C. § 1988, 31

U.S.C. § 3730(h), and any other applicable authority;

h. Pre-judgment and post-judgment interest as allowed by law; and

i. Such other and further relief as the Court deems just and proper.

**JURY DEMAND**

139. Plaintiff demands a trial by jury on all issues so triable, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

**CERTIFICATION**

140. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this Complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the Complaint otherwise complies with the requirements of Rule 11.

Respectfully Submitted,

**LLG NATIONAL LAW GROUP**

Dated: November 23, 2026



Robert S. Mactavish
Florida Bar No.: 0596388
523 Route 73 North
Marlton, NJ 08052
P: 575-517-6542
robert.mactavish@llgnational.com
*Attorney for Plaintiff*
*Admitted Pro Hac Vice*